CALVIN J. JOHNSON, APPELLANT, VS. THE PENSACOLA AND GEORGIA RAILROAD COMPANY, APPELLEE.

1. The principle of law which will not allow the terms of a written contract to be varied by parol evidence, is as applicable to subscriptions for railway stock as to any other written contract.

2. The acceptance by the Pensacola and Georgia Railroad Company of the provisions of the act of 6th January, 1855, to provide for and encourage a liberal system of internal improvements in this State, did not materially alter or change the original charter of said Railroad Company.

3. Nor did such acceptance materially enlarge or diminish the power conferred by the original charter upon the board of directors of said company to locate the route and fix the terminal points of the road.

4. The power conferred by the original charter upon the board of directors to locate the road and to fix the terminus thereof on the boundary line between the States of Florida and Georgia, is not infringed by the act of 15th December, 1855, amendatory of the original act of incorporation of the Pensacola and Georgia Railroad.

This case was decided at Tallahassee.
Appeal from Leon Circuit Court.

This was an action of assumpsit, instituted to recover the instalments of stock subscribed for by Johnson, the appellant. The defendant pleaded non-assumpsit, upon which issue was joined, and under this plea it was agreed that all substantial defences should be admissible.

The following bill of exceptions appearing in the record, gives a statement of the evidence offered at the trial and the instructions of the Court:

The counsel for the plaintiff to maintain and prove the issue on his part, offered in evidence the first subscription list to the Pensacola and Georgia Railroad, on which appeared the name of the defendant as a subscriber. It was admitted that the calls had been regularly made, and here the plaintiff closed.

The defendant's counsel to maintain the issue on his part, offered Gen. R. A. Shine as a witness, who proved that he himself had subscribed for shares in the same Railroad, to the amount of one hundred thousand dollars. The defendant offered to prove by this witness the inducements and circumstances which led to the subscription to the Railroad, at the time of the first subscription, which was objected to and the objection sustained, to which ruling of the Court herein the defendant by his counsel excepted.

Witness was then asked what was the understanding of the subscribers when they subscribed, which was objected to, and the objection sustained by the Court, to which counsel for defendant excepted.

Witness was then asked to what point the road was being constructed, which was ruled to be a proper question, and witness proved that it was in course of construction to Alligator, not on the Georgia line; that he is a director in said Company, and that there has been no survey of any road to the Georgia line and no action taken by the Company having for its object the running of the road from Alligator or any other point to the Georgia line, and that

when he and Johnson first subscribed, it was to a road to be constructed to the Georgia line ; that he, witness, and many other large subscribers were released from their original subscription for stock after the acceptance of the provisions of the Internal Improvement Act by the Company, which acceptance was proved.

The defendant then offered in evidence the minutes of the Company, and the acceptance of the act of 1855, together with the charter of said Company and the act amendatory thereof, which minutes so offered without objection as follows :

"Tallahassee, November, 28, 1853. *Resolved*, That correspondence be forthwith opened with the Corporation and citizens of Savannah and Albany Railroad Company, to inform them that this Board is fully organized and is prepared to discuss all matters of mutual interest to the two companies, as well in regard to the proper point at which their contemplated branch road should enter Florida in view of extending it to Pensacola, under the charter granted in this State, as also to ascertain what provision they propose to make, either by subscription of stock in this Company or in any other way, for the completion of this road from the point of junction to its western terminus, over and above the sum of $800,000 pledged to be subscribed in Florida or above any larger sum that may be so subscribed, it being apparent that the work will require an addition of two million of dollars.

" 2. *Resolved*, That immediate correspondence be opened with the Atlantic and Gulf Central Railroad Company in order to secure harmony of action in application to Congress for a grant of public lands contiguous to the respective road and in order to bring the subject before that body early in the session. And by this correspondence, this board desires to express the deep interest it feels to harmonize with these companies in regard to their Eastern or Atlantic terminus in our

own State, and in the location of the lines of road extending westward and southward from such terminus in view to a junction with this road in the most favorable manner, for the purpose of ultimately binding all sections of the State by an extensive Railroad system.

"4. *Resolved*, That the Apalachicola Land Company being large landed proprietors in the neighborhood of the contemplated road, should be invited to subscribe liberally to its stock or urged to aid in its construction by a grant of land in view of the greatly enhanced value it would confer on their lands generally.

" And it is further ordered that the large subscription made on the 8th of October last, in the subscription book at Tallahassee, by Richard Hayward, R. A. Shine, Benj. F. Whitner, John C. McGehee, Ed. Houston, D. C. Wilson and Edwd. Bradford, for themselves and their associates, are exempted from the payment of the instalment now called in, as stipulated and provided for at the meeting of the stockholders, and are therefore not liable to be forfeited."

" TALLAHASSEE, Jan. 11, 1854.

" A letter was read from A. S. Baldwin, President of the Atlantic and Gulf Central Railroad Company, containing resolutions adopted by that Company on the subject of a connection with this, and an exposition or agreement against our proposed junction with a road from Savannah, and in favor of our asking a repeal of our charter, a transfer of our subscriptions to that of the Central Road, and of. making the St. Johns, i. e., Jacksonville, the Atlantic terminus. After due consideration, the Board was unanimously of opinion that these resolutions and agreements present no sufficient inducement or reason for changing our present. plan, while we still desire to cultivate harmony and good understanding with the A. and G. C. and Florida Railroad Companies, and believe there will be no serious difficulty, if there is a mutual desire among the parties."

"TALLAHASSEE, 10th Feb. 1855.

" It was agreed to postpone a full organization of the Board by the election of permanent officers until the 11th April next. The Secretary was instructed to notify the Trustees of the Internal Improvement Fund of the full acceptance by this Company of the provisions of the act to provide for and encourage a liberal system of Internal Improvements in this State, approved 6th January, 1855, and to specify the route lying between Pensacola or the waters of Pensacola Bay and the point of intersection with the Florida Railroad on the most direct practical line to Jacksonville, (with a view to an extension afterwards to the Georgia line) as that over which this Company propose to construct its road, which notice is in conformity with the two first resolutions at the recent stockholders' meeting."

"TALLAHASSEE, Oct. 18, 1855.

" The President stated that the object for calling a meeting of the Board at this time was to consider and act on the report of the Engineers, who have been engaged in making surveys of various routes for a Railroad from Tallahassee to the town of Alligator, in the county of Columbia. It was expected that the reports, estimates, &c., would be ready to be submitted to the Board."

" The P. & Ga. Railroad Company, if they be compelled to seek a terminus on the Georgia line east of the terminus now contemplated in Hamilton county, may use any part of the Atlantic and Gulf Central Company as part of the road of the Pensacola and Georgia Company to the Georgia line. And in like manner the Atlantic and Gulf Central Company may use any part of the road of the Pensacola and Georgia Railroad Company which may intervene between roads on the main line constructed by the Atlantic and Gulf Railroad Company."

"If, when the Pensacola and Georgia Railroad Company shall have constructed their road to Alligator, the other

304          SUPREME COURT.

Johnson vs. P. and Ga. R. R. Company.—Statement of Case.

Company shall not have constructed theirs to that point, the former company shall be at liberty to construct eastward to the Florida Road, or to a junction with the road from Jacksonville west, and in the latter event the connection at the point of meeting shall be made on the same terms as provided for a connection at Alligator. And if any part of the work from Alligator eastwardly shall have been performed, the Pensacola and Georgia Railaoad Company may adopt that work as part of their road, they paying therefor the stock of their company to the amount of the cost of the work. And the Atlantic and Gulf Central Railroad Company, if the other Company do not construct their road to Alligator by the time the Atlantic and Gulf Central Railroad Company shall have constructed theirs to that point, to be at liberty to construct westwardly until they connect with the road of the Pensacola and Georgia Railroad Company, and a connexion at such point of meeting shall be established on the same terms as provided for a connexion at or near Alligator.

"Fifth, passengers, freight and cars of each company shall pass over each road with the same facilities as if the whole road had been constructed by one company. And passengers, freight and cars on the road to the Georgia line coming south to the main line from Jacksonville to Pensacola Bay, whether going east or west after reaching said main line, or passengers, freight and cars passing from any point on the main line from Jacksonville to Pensacola Bay and going up the road to the Georgia line, shall pass with the same facilities as if they shall continue on the main line from Jacksonville to Pensacola Bay.

"The two companies shall unite in asking the General Assembly to ratify and confirm the agreement which shall be made between them by proper amendments to their respective charters, in such manner as to give effect to their agreement."

"After some discussion, the report and all the foregoing specifications, except the fifth, were adopted, and it was ordered that a copy of the report and specifications and the action of this Board thereon be communicated to the Fla., Atlantic and Gulf Central Railroad Company by the President of this Company.

"The President stated that he had heard officially that the Tallahassee Railroad Company have appointed a committee to meet a committee of this Board to confer together as to the terms and conditions on which a junction of the roads of the two companies can best be effected.

"A vote was then taken on the various modifications of this route, and resulted in the adoption of *line* 2, which runs from Tallahassee to or near Bailey's, then near Captain Baileys and Wm. Scrugg's, in Jefferson county, and crossing the Aucilla below Sandy Ford, passes through the northern part of Patterson Hammock, and leaving Madison C. H. to the north, crosses the Suwannee river near Columbus, and thence to a point near Alligator, in Columbia county."

It was admitted that at the time of the subscription made by Johnson to the stock of the Pensacola and Georgia Railroad, whose name is on the first subscription list, that said subscription was made, together with others, with a view to a connection with Georgia and to control the majority of the stock of the Pensacola and Georgia Railroad and secure a connection. Here defendant closed.

The plaintiff then called F. H. Flagg as a witness, who proved that the Pensacola and Georgia Railroad Company commenced work in the fall of 1855, and that the road is graded to the Suwannee. The same witness stated that he was Secretary and Treasurer of the Company—that the subscription sought to be recovered in this case was needed to pay indebtedness incurred in constructing the first twenty miles of the road from Tallahassee eastward ; that con-

37

306 SUPREME COURT.

Johnson vs. P. and Ga. R. R. Company.—Statement of Case.

tractors for building the road from the Suwannee river to Alligator are to be paid exclusively in lands obtained by the Company under the provisions of the Internal Improvement Act, and stock in the Company.

The subscription of the 9th May, 1855, was offered in evidence, without objection. Mr. Flagg was asked by plaintiff as to the acquisitions of the Company under the act of 1856; objected to by defendant and objection sustained.

Cross examined and asked whether defendant was present at the meeting of stockholders which accepted the Internal Improvement Act. He stated that he did not know, that he never saw him, does not know that he ever assented to change in the route of the Pensacola and Georgia Railroad, from the original contemplated route, to the line of Georgia. General Shine also proved the same thing. Walter Gwynn, a witness for plaintiff, testified that the Pensacola and Georgia Railroad will be entitled, under the act of Congress of 17th May, 1856, to 1,167,360 acres of land, and under the act of the Legislature of Florida, of 6th January, 1855, to 139,210 acres of State land.

"I have located, examined and appraised on the line between Tallahassee and Alligator, 363,607 84-100 acres which I have appraised at an average of about $1 79 per acre; of this, about 200,000 acres lie in Columbia county, between the Suwannee river and Alligator, my average appraisement, of which is about $2 08 per acre.

Here the testimony closes, and after argument of counsel, the counsel for the defendant moved the Court to charge the jury as follows : " That the charter of the P. and Ga. Railroad Company as it existed at the time of the defendant's subscription is as much a part of the contract as though the same had been embodied in the caption to the subscription paper, and that no material alteration could be made in said contract by the Pensacola and Georgia Railroad Company

or by the defendant without the consent of both parties. *Therefore*, if the jury find that the road now in the course of construction is a different road from that set forth and contemplated in the original charter, the defendant is not bound for the instalments called in, unless *the assent* to such change of route by the defendant has been proved, or if the jury find that the terminus of the present road is at a point not contemplated by the original charter, the defendant is not bound, unless *his assent* to such change is proved. .

" That the charter constituted a part of the contract of subscription and that an alteration in the route of the road or in its terminus, which would defeat the original object intended by the corporation, would release the defendant if made without his consent.

"If the jury believe that from the evidence the original objects and purposes of the defendant in subscribing for the route and terminus contemplated in the original charter were materially defeated by the adoption of the present route and terminus, then he was not further bound for his subscription and they should find for the defendant."

Which instructions were refused, and in lieu thereof the Court gave the following: " The charter of the Pensacola and Georgia Railroad Company as it existed at the time of the defendant's subscription is a part of the contract and no material alteration could · be made in said contract by the Pensacola and Georgia Railroad Company or by the defendant without the consent of both parties. If, therefore, the jury believe, from the evidence, that the road now being constructed is a different road from that set forth in the original charter, the defendant is not bound unless he assents, or if the jury believe from the evidence that the terminus of the present road is at a point not contemplated by the original charter, the defendant is not bound unless he assents to the change."

The counsel for plaintiff then asked the following instructions, which were given :

" That the acceptance of the Internal Improvement Act is consistent with the purposes of the Pensacola and Georgia Railroad Company, and is auxiliary only. That the acceptance by the Pensacola and Georgia Railroad of the Internal Improvement Act was an act of the stockholders of said Company, and if the charter of the Company is violated by said acceptance, the charter is not thereby altered but the act of acceptance is void.

" That the Pensacola and Georgia Railroad Company after the subscriptions were made, could determine its eastern terminus at any place on the Georgia line, and from time to time change its policy as to the eastern terminus. That the Company was competent to stipulate for a terminus east of the Alapaha.

" That the defendant must show that he made timely objection to the acceptance of the Internal Improvement Act, and the presumption is, in the absence of proof to the contrary, that he assented to the action of the stockholders, who unanimously accepted the act. And especially is this presumption proper where the Company has contracted debts to large amounts before any objection is made."

To which instructions so given and to the rulings of the Court herein, the defendant, by his counsel, excepted.

Defendant asked the following charge : " If the jury shall believe from the evidence that the Legislature or the corporation have undertaken to embark this corporator in a speculation to which he never consented, or in an enterprise to which he never gave his consent, then he is absolved from his subscription and the majority cannot bind him," which instruction was refused.

To all which. refusals of the Court to admit or allow the evidence of the defendant and the charges given for plaintiff and refusal to give the charges asked by defendant and the

rulings of the Court therein, defendant by his counsel did then and there except.

A verdict and judgment having been rendered for the plaintiff, the defendant appealed.

*W. Call* for appellant.

*Gwynn & Hilton* for appellee.

Hon. J. J. FINLEY, Judge of the Western Circuit, who sat in this case in place of Hon. D. S. Walker, disqualified for having been of counsel for the defendant in the Court below, delivered the opinion of the Court.

The Pensacola and Georgia Railroad Company instituted an action of assumpsit in the Leon Circuit Court against Calvin Johnson, the plaintiff in error, for the recovery of certain calls, amounting to two hundred and fifty dollars, which were admitted by the defendant upon the trial to have been regularly made, upon his subscription for stock in said Railroad.

The defendant pleaded "non-assumpsit," upon which plea issue was joined, and the parties went to trial, with the agreement and understanding that the defendant should be allowed, under the plea of the "general issue," to make any and all substantial defences which he might have.

In pursuance of said agreement, and under the said plea, certain issues of fact were submitted to the jury who were empannelled in the case, all of which issues were found against the defendant; but as their finding is not put in question by the record, it will not require the consideration of this Court.

The record in this case presents only three questions for the consideration of this Court, and they all arise upon exceptions taken to the rulings of the Judge on the trial in the Court below. These questions are as follows, to-wit:

1. Will parol evidence be received to prove the inducements to a subscription for railway stock?

2. Was the original charter of the Pensacola and Georgia Railroad Company materially or fundamentally altered or changed by the acceptance of the Internal Improvement Act of the 6th January, A. D. 1855, or by the act of the 15th December, A. D. 1855, amendatory of the original charter of said Company?

3. If such change or alteration of the original charter were made, was it necessary, in order to have entitled the plaintiff to have recovered against the defendant in action upon his stock subscription, to prove that such alteration was made with the assent of the defendant; or will such *assent* be presumed, unless the defendant should prove his *dissent?*

The first question is not made in the assignment of errors nor insisted on in the argument here. This point was understood to have been abandoned by the plaintiff in error; but if by any means the Court should have fallen into mistake in regard thereto, such mistake will be cured by its giving, as its opinion, as it now does, that the Court below did not err in rejecting parol evidence to prove the inducement to the defendant's subscription for stock in the Pensacola and Georgia Railroad, it being an established principle of law, which is as applicable to subscriptions for railway stock as to any other written contract—*that parol evidence will not be received to vary the terms of a written contract*, unless in case of fraud, &c.

We are next to consider the effect of the acceptance of the Internal Improvement Act, by the Pen. and Ga. R. R. Co., and the effect of the amendatory act of the 15th December, 1855, upon the original charter, under which the defendant made his subscription for stock, and under which the said Company organized.

The record shows that on the 10th day of February,

A. D. 1855, the Board of Directors of said Company accepted the provisions of the Internal Improvement Act, and instructed their Secretary to notify the Trustees of the Internal Impovement fund of such acceptance, and to specify the route between Pensacola or the waters of Pensacola Bay and the point of intersection with the Florida Railroad, in the most direct practical line to Jacksonville, (with a view to an extension afterwards to the Georgia line) as that over which this company proposes to construct its road.

No power was reserved to the Legislature in the original act of incorporation to alter, amend or repeal the same, and the principle which we have drawn from the current of judicial decision upon this point is, that the charter of a railroad company contains the terms of the contract between the Legislature granting it and the company incorporated under it, and also the terms of the contract between the company and the individual stockholders or corporators, and that no material or radical change or alteration can be made in the charter after a subscription for stock, so as to bind such subscriber without his consent.

We will first proceed to enquire whether such change or alteration has been made in the original charter of the Pen. and Ga. R. R. Co., by reason of its acceptance of the provisions of the Internal Improvement Act.

Is there anything contained in the Internal Improvement Act, which being accepted by the Pen. and Ga. R. R. Co., works a material or essential alteration in the original charter of that Company?

To answer and dispose of this question satisfactorily, it will become necessary to examine with great care the provisions, both of the original act of incorporation and of the Internal Improvement Act, at least so far as those provisions may relate to and affect the power granted to the Board of Directors to locate the route and terminal points of the road.

312      SUPREME COURT.

Johnson vs. P. and Ga. R. R. Company.—Opinion of Court.

By the first section of the original charter, the Commissioners are authorized to open books and to receive subscriptions for stock in a "railroad to be constructed from the city of Pensacola, or any other point or points on the waters of Pensacola Bay in Florida, and running thence in an eastwardly direction to the western or southern boundary line of the State of Georgia."

And by the third section of the same act, it is provided, "that said Railroad shall extend from the city of Pensacola, or any other point or points on the waters of Pensacola Bay, running eastwardly to some point on the boundary line between the States of Florida and Georgia, *to be determined by a majority of the Board of Directors of said Company.*"

The foregoing are the only provisions in the original charter which relate to the location of the route and termini of the road.

The power is expressly given to the Board of Directors to fix one of the terminal points of said road any where upon the waters of the Bay of Pensacola, and the other, any where upon the boundary line between the States of Florida and Georgia. And we think there can be but little doubt but that the Board of Directors had the power, under the charter, at any time to alter and change its policy as to the location and terminus of the road, even without the consent of the individual stockholders, *provided* they run said road from some point on the Bay of Pensacola, in an eastwardly direction, to some point on the boundary line between the States of Florida and Georgia.

But it is insisted for the plaintiff in error, that the acceptance of the provisions of the Internal Improvement Act did work a radical and fundamental change in the orginal charter, in regard to the location of the road and its terminus on the Georgia line.

As to the question whether the Board of Directors did, in

*point of fact*, alter or change the location of the road in a manner which was violative of the original charter, it has been definitely settled by the verdict of the jury, and cannot be enquired into by this Court, for the reason heretofore stated, that the finding of the jury is not put in question by the record.

But the question presented to the Court upon the record is, whether there is any provision in the Internal Improvement Act which materially alters or changes the power which the Company derived from its original charter to establish the route and to fix the terminal points of the road.

In order to ascertain this, we must examine such of the provisions of the Internal Improvement Act as bear upon the questions of the location and termini of the road.

The 4th section of the Internal Improvement Act designates as a proper improvement to be aided by the Internal Improvement fund, " a line of railroad from the St. Johns river, at Jacksonville, to the waters of Pensacola Bay," with extensions to certain points on the Gulf of Mexico, and elsewhere. And the 5th section of said act provides, that any railroads which were then organized or chartered, or which might thereafter be chartered by the Legislature, and whose routes, in whole or in part, as authorized by their own charters, should be or lie within the line so to be aided by the Internal Improvement fund, should have the right to construct that part of the said line from Jacksonville to Pensacola Bay, as might be embraced by their own charters, provided the provisions of said act should be accepted by them within the time and in the manner prescribed by said act.

It is clear that there is nothing contained in the 4th and 5th sections of the Internal Improvement Act which altered or in any wise changed the power which was conferred by

38

the original charter upon the Board of Directors to determine the location and to fix the terminal points of said road. For it is manifest from the plain and unequivocal language employed in the third section of the original charter, that the Legislature intended to confer upon the Board of Directors an unrestricted power to fix the terminus of said road, after leaving Pensacola Bay and running thence eastwardly, *anywhere* and at *any point* on the boundary line between the States of Florida and Georgia. And it is equally manifest that the 5th section of the Internal Improvement Act only authorized the said Company to construct so much of their own road as could, by authority of its own charter, be located on the line of road designated in the 4th section of said Internal Improvement Act, as an improvement to be aided by the Internal Improvement fund.

The Internal Improvement Act simply designated an open line from Jacksonville to the Bay of Pensacola, as a line to be aided by the fund which is set apart, without granting a charter to any company or companies to construct a road upon that line, but creating and presenting very important and inviting inducements to any Railroad Companies which were then chartered, or which might thereafter be chartered by the Legislature, to locate and construct so much of their respective roads as might be authorized by their respective charters, upon the line so indicated in the 4th section of the Internal Improvement Act.

But it is contended for the plaintiff in error, that the 24th section of the Internal Improvement Act, the provisions of which were accepted by the Pen. and Ga. R. R. Co., does so essentially alter and change the original charter of said Company as to impede, delay, obstruct and prevent the establishment of a terminus on the Georgia line. We are of opinion, after much consideration and careful examination of the matter, that nothing contained in the said 24th section of the Internal Improvement Act will be found,

under a fair and just construction of the same, to invade, impair or destroy the powers conferred by the 3d section of the original charter upon the Board of Directors to locate said road, and to determine upon and fix the points of its termination.

The 24th section of the Internal Improvement Act provides "that no branch road from the main line of Railroad provided for by this act, between the waters of Pensacola or Escambia Bay and the junction of the Florida Railroad, shall be made to the northern boundary of this State, until that part of the line between the Suwannee river and the Florida Railroad has been constructed, nor shall any such branch road be made to a point west of the Alapaha river without the consent of all the companies owning the several portions of the main line and without the approval of the trustees of the Internal Improvement fund."

Now, it has been seen that the Board of Directors of the Pen. and Ga. R. R. Co., under its original charter, were clothed with the express and unrestricted power to locate their road from *any point* on the Pensacola Bay to *any point* on the boundary line between Florida and Georgia, and as it will appear from the record in this case, said Board of Directors did, at the time of the acceptance by the stockholders of the provisions of the Internal Improvement Act, specify as the part of the line provided for in said act, and embraced in their own charter, and which they intended to construct, the line from Pensacola Bay to the point of intersection with the Florida Railroad Company in the most direct practicable line to Jacksonville, with the *expressed view to an extension afterwards to the Georgia line.*

If the original charter granted the unrestricted power to the Board of Directors to run their road to *any* point on the Georgia line, then we think it can hardly be questioned but that they had the power to extend said road

eastwardly, the direction specified in their charter, until they should intersect the Florida Railroad.

If the Pensacola and Georgia Railroad Company had the power under its original charter to run its road eastwardly until it intersected the Florida Railroad, and did so locate the road eastwardly from Pensacola Bay so as to intersect the Florida Railroad in the most direct practicable line to Jacksonville, and so as to bring it upon the open line designated in the 4th section of the Internal Improvement Act, with a view to an extension afterwards to the Georgia line, then it will be seen that so soon as so much of the Pensacola and Georgia Railroad shall be constructed as will be necessary to effect the intersection with the Florida Railroad, that part of the line designated by the 4th section of the Internal Improvement Act and which lies between the Suwannee river and the said intersection will necessarily have been constructed and completed, so as fully to meet and satisfy all the conditions and restrictions imposed by the 24th section of said act, so that the Pen. and Ga. R. R. Co. will neither be prevented nor delayed in extending their road to such point on the Georgia line as the Board of Directors of such company may, in the exercise of the power given them in the charter, determine and establish.

Then the acceptance of the provisions of the Internal Improvement Act did not confer upon the Pen. and Ga. R. R. Co., any power in regard to the location of the road, and the fixing its termini, which it did not before possess, nor did it take away from said Company any power with which it was clothed by its original charter.

It is therefore the opinion of the Court, the acceptance of the provisions of the Internal Improvement Act by the Pen. and Ga. Railroad Company did in no manner abridge, alter or destroy the power which it possessed under its original charter, to locate their road and to fix and establish the termini thereof.

The Board of Directors in locating their road so as to intersect the Florida Railroad, by running eastwardly from Pensacola Bay, have not attempted to construct a road in a different direction from that authorized by its original charter, as was the case of the Middlesex Turnpike Co. vs. Lock, decided by the Supreme Court of the State of Massachusetts, and in the case of the Buffalo, Corning and New York Railroad Company vs. Pottle, decided by the Supreme Court of New York.

In selecting the route or line indicated by the 4th section of the Internal Improvement Act from Pensacola Bay to an intersection of the Florida Railroad, in the most direct practical line to Jacksonville, the Pen. and Ga. R. R. Co., only exercised a power which was conferred by its original charter.

Nor does the location of this route by the Board of Directors of the Pen. and Ga. R. R. Co. cause an extension of their line of road beyond a point originally authorized by its charter as was the case in Macedon and Bristol Plank Road Co. vs. ————, decided by the Supreme Court of New York. Because here, the Company are authorized to go to any point on the Georgia line, and as it appears from the record, they make their intersection with the Florida Railroad, by running in an eastwardly direction from Pensacola Bay, as specified in their charter, with the declared purpose of extending their road to the Georgia line, as they were expressly authorized by their charter to do.

Nor did the Internal Improvement act, which was accepted by the P. & Ga. Railroad Company, authorize or require said Company to enter upon a new and different enterprise from that contemplated by the original charter, as was the case in Keene vs. Johnson, decided by the Supreme Court of New Jersey, and in the case of Hester vs. The Memphis & Charleston R. R. Co., decided by the Supreme Court of Mississippi. For the enterprise in which the plaintiff in error agreed

to participate, was the construction of a Road from the waters of Pensacola Bay to any point on the Georgia line, the location and termini to be adopted and fixed at the discretion of the Board of Directors, and the acceptance of the Internal Improvement Act does not compel the P. & Ga. Railroad Company to construct any other than a Road from the waters of Pensacola Bay to some point on the Georgia line yet to be determined by the Board of Directors, in the exercise of the power conferred by the charter.

But it is contended that the amended Act of the 15th of December, 1855, materially altered the original charter as to the location and termini of the Road.

We might here remark that there is no evidence in the record to show that the Company ever accepted the amended charter ; and if not accepted by them, it could in no way affect the question now before the court.   It does appear, however, in the record, that a proposition was before the Board of the P. & Ga. Railroad Company, in regard to an intersection with the Atlantic & Gulf Central Railroad Company, which might be made at Aligator, in Columbia county, or East or West of that place, according to the progress which might be made by the P. & Ga. Railroad Company to the East, and by the A. & G. C. Railroad to the West.   But the record does not show with which of said Companies such proposition originated.   Nor does the record show that it was ever adopted by the A. & G. C. Railroad Company.   One of the resolutions adopted at the same time by the P. & Ga. Railroad Company, was to the effect that the two Companies should unite in asking the Legislature to ratify and confirm the agreement which *shall* be made between them, by proper amendments to their respective charters, in such a manner as to give effect to their agreement ; and it appears that the Legislature did, at its next session, amend the charter of the P. & Ga. Railroad Com-

pany, but there is no corresponding amendment of the charter of the A. & G. C. Railroad Company.

The amended charter simply authorized the P. & Ga. Railroad Company to build an extension of their Road to a junction with the A. & G. C. Railroad at or in the vicinity of Aligator, with a provision, that if the latter Company should fail to construct its Road to Aligator by the time the P. & Ga. Railroad Company constructed its Road to that point, then the said last mentioned Company might extend east of Aligator, or to a junction with the Florida Railroad, which, it should be remarked, is the point to which the P. & Ga. Railroad Company had already determined to go, as early as the 10th of February, 1855, and which determination had been formally notified to the Trustees of the Internal Improvement Fund.

Now admitting, for the sake of argument, that such agreement had been made between the two Companies, and that the Legislature had amended both their charters, so as to ratify and confirm the agreement, and that the P. & Ga. R. R. Company had accepted the amendment which authorizes the junction with the A. & G. C. Railroad Company, we cannot see that such amendment would confer any greater power upon the P. & Ga. Railroad Company to locate its Road or fix the termini, than it had under its original charter.

Indeed the record shows, that the P. & Ga. Railroad Company had, ten months before that time, specified the route or location of their Road, as far as the junction with the Florida Railroad; and even if it had entered into an agreement with the A. & G. C. Railroad Company, by which the junction with that Road was to be made at any point West of the Florida Railroad, it would, if constructed to such junction, have necessarily completed the very line designated by the Internal Improvement Act, between the Florida Railroad and the Suwannee River, and consequently no obstacle would have been in the way of the extension

320      SUPREME COURT.

Johnson vs. P. and Ga. R. R. Company.—Opinion of Court.

of the P. & Ga. Railroad to the Georgia line immediately after its intersection with either the A. & G. C. Railroad or the Florida Railroad, in pursuance of the requirements of the charter of said P. & Ga. Railroad Company, and of the declared purpose of its Board of Directors.

But the record does not show that this proposition for a junction with the A. & G. C. Railroad Company was ever agreed to by said Company; and as the Legislature has passed no act amendatory of its charter, so as to ratify and confirm any agreement which may have been made between the two Companies, and as the Resolution adopted by the P. & Ga. Railroad Company simply invites a joint application for an amendment of their respective charters, to confirm and ratify—not such agreement as had been made, but as *shall* be made between them, it is rather to be presumed that no such agreement was ever made by the A. & G. C. Railroad Company.

But let the fact be as it may, the record does not show any such agreement, and the amended charter, made in pursuance of such proposed agreement, would not have materially changed or altered the original charter in respect to the power conferred by it upon the Board of Directors, for the location and terminus of the Road, as did the amended charter in the case of Winter vs. The Muscogee Railroad Company, decided by the Supreme Court of the State of Georgia.

As to the extensions provided for in the amended charter to Crooked River and elsewhere, it does not appear in the record that the P. & Ga. Railroad Company ever applied for or accepted such amendment of their charter.

The mere passage by the Legislature, when the power is not reserved, of an amendment which materially affects or alters the original charter of a Railway Company, cannot bind such Company until, in some authorized manner, it shall accept such amendment.

But even supposing the amended charter had been accepted by the P. & Ga. Railroad Company, so far as it provides for a junction with the A. & G. C. Railroad, it would, as we have seen, have left the P. & Ga. Railroad Company with unimpaired power to execute, substantially, the original work and enterprise authorized by its original charter, as was the case in the Pacific Railroad Company vs. Hughes, decided by the Supreme Court of Missouri, and as was much more strongly ruled in Barret vs. The Alton & Sangamon Railroad Company, decided by the Supreme Court of the State of Illinois.

In the latter case the Legislature had authorized by an amendment, which was adopted by the Board of Directors, a change of route which was different from that *fixed* by the original charter.

As we have seen the original work authorized by the charter of the P. & Ga. Railroad Company was the construction of a Railroad from the waters of Pensacola Bay to some point on the Georgia line, to be determined by the Board of Directors. The power to execute this work, substantially, as authorized by the charter, was neither impaired nor destroyed by any agreement to form a junction with the A. & G. C. Railroad, and as we have already seen, such a junction being effected on the line already located by the P. & Ga. Railroad Company would neither have delayed nor prevented such extension.

It is, therefore, the opinion of the Court, that the amended charter of the 15th of December, 1855, so far as the record in this case may show that it has been acted upon by the P. & Ga. Railroad Company, (if indeed it has been acted on at all by said Company,) does not materially alter or change the original charter of said Company, in regard to the powers conferred by such original charter upon the Board of Directors of said Company, to locate the route and ter-

minus of said Road; and consequently does not invade the contract of subscription made by Johnson for stock in said P. & Ga. Railroad Company.

When Johnson subscribed for stock in said Road, it was under the original charter, which was approved the 8th of January, A. D. 1853. Said charter did not fix the Georgia terminus of the Road, but expressly left it to be determined by the Board of Directors. In subscribing for stock in said Road, he undertook to abide by any terminus on the Georgia line, which the Board of Directors, in their discretion, might adopt.

In signing the books as a subscriber for stock in said Road, he did, in effect, sign the charter, and placed it in the hands of the Company organized under it, and said, " You are authorized by me to do anything which said charter empowers you to do, and I will abide by it."

Seeing that neither the acceptance of the Internal Improvement Act by the P. & Ga. Railroad Company, nor the amended Act of the 15th of December, 1855—so far as the record may show that the Company acted under it, cannot materially or essentially alter the original charter of the said Company, in regard to the location and termini of said Road; and seeing that they do not invade the contract of subscription made by Johnson for stock in said Road, it becomes wholly unnecessary to enquire as to the remaining question made by the record in this case, which is, whether to make Johnson liable in a suit for the calls upon his subscription for stock in said Road, it is necessary to prove his assent to material alterations made in the charter since his subscription was made, or whether his assent will be presumed, in the absence of proof of his dissent.

If, as we have decided, there was no material change or alteration in the charter, occasioned by the amended charter of the 15th of December, 1855, nor by the acceptance of the Internal Improvement Act, then the question of assent or dissent cannot arise.

Taking this view of the case we see no cause for disturb-ing the judgment of the Court below.

It is therefore ordered and adjudged that the judgment of the Circuit Court be affirmed with costs.